UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

SEA METROPOLITAN SA of PANAMA                     CIVIL ACTION

VERSUS                                             NO. 09-4238

DGM COMMODITIES CORP. and                          SECTION "N" (3)
COMMODITIES INTL., INC.

**ORDER AND REASONS**

Presently before the Court is Plaintiff's "Motion for Security" (Rec. Doc. 89). With its motion, Plaintiff asks the Court to require Defendants, DGM Commodities Corporation ("DGM") and Commodities International, Inc. ("CI"), to post security in the amount of $6,101,949.49 because they allegedly "engaged in a less than forthright course of conduct . . . to deceive the Court into releasing the cargo onboard the M/V GLACIER BAY from attachment" on July 6, 2009.[1]  For the reasons stated herein, **IT IS ORDERED** that Plaintiff's motion is **DENIED**.

In support of the relief requested by its motion, Plaintiff maintains that, pursuant to §2-401 of the Uniform Commercial Code ("UCC"), CI and its alleged alter ego, DGM, rather than the poultry suppliers – Sanderson Farms, Inc., Pilgrim's Pride Corp., Simmons Prepared Foods, Inc., Tyson Foods, Inc., Mountaire Farms Corp., and Gerber Agri International LLC. ("suppliers") –

---

[1] *See* Plaintiff's Motion for Security (Rec. Doc. 89) at 1. The cargo consisted of frozen chicken. The relevant facts regarding the cargo transactions and events thereafter are set forth in the record in the several memoranda filed by the parties, as well as the transcripts of court hearings, and largely are not in dispute. Rather, the issue presented herein turns on the documents submitted as exhibits and the application of the Uniform Commercial Code, as set forth hereinafter.

1

owned the GLACIER BAY cargo at the time that it was attached on July 1, 2009, and then released on July 6, 2009. Having carefully reviewed the parties' numerous submissions,[2] the record, and pertinent legal authorities, the Court, for essentially, the reasons stated in Defendants' supplemental memoranda (Rec. Docs. 125 & 126), is not convinced that Plaintiff is correct. Rather, on the showing made, the Court again concludes that the attachment was properly vacated. Thus, the Court declines to require Defendants to post the security requested by Plaintiff in its motion.

In reaching these conclusions, the Court emphasizes that the question before it is a close one, and that compelling arguments have been advanced by both interests in the case. Viewing all of the evidence cited by the parties, and carefully considering the supporting and opposing arguments, however, the Court finds Defendants' position, at least in the context of the particular dispute at issue here, to prevail.

Specifically, §4-2-401 of the Arkansas Code Annotated provides:

> **§ 2-401. Passing of Title; Reservation for Security; Limited Application of this Section.**
>
> Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:
>
> (1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§4-2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this subtitle. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.

---

[2] As the parties are well aware, numerous written and oral submissions have been made in support of and in opposition to Plaintiff's motion. *See* Rec. Docs. 89, 115, 123-27, and 131.

Subject to these provisions and to the provisions of the chapter on secured transactions (chapter 9 of this title), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading:

> (a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; but
>
> (b) if the contract requires delivery at destination, title passes on tender there.

(3) Unless otherwise explicitly agreed where delivery is to be made without moving the goods:

> (a) if the seller is to deliver a tangible document of title, title passes at the time when and the place where he delivers such documents and if the seller is to deliver an electronic document of title, title passes when the seller delivers the document; or
>
> (b) if the goods are at the time of contracting already identified and no documents of title are to be delivered, title passes at the time and place of contracting.

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale".[3]

---

[3] The Court references § 4-2-401 of the Arkansas Code because the parties did so in their briefs. The 2003 version of § 2-401 of the Uniform Commercial Code, however, varies only slightly. *See* U.C.C. § 2-401.

As an initial matter, the Court agrees with Plaintiff that §4-2-401 limits a seller's contractual freedom to reserve title in goods that have been delivered to the buyer. That is, after delivery, any such reservation of title is limited "in effect to a reservation of a security interest." *See* A.C.A. § 4-2-401; *see also In re Samuels & Co., Inc.*, 526 F.2d 1238, 1246-47 (5th Cir. 1976)(addressing U.C.C. §2-401 as adopted in Texas). Thus, the Court must determine whether, at the time of Plaintiff's attachment: (1) the suppliers retained title to the cargo under the terms of their agreements with CI; and (2) the cargo had been delivered for purposes of §4-2-401.

Essentially the same facts inform these inquiries. First, the Court notes the affidavits, declarations and/or deposition testimony of current or former representatives of the vessel operator, each of the suppliers, CI, the broker for the GLACIER BAY charter party, and the vessel's agent that support Defendants' position.[4] Even more important, however, are the written agreements between the suppliers and CI (the "third party agreements") and the vessel charter party.

Specifically, the third party agreements provide that the bills of lading to be issued for the loaded cargo were to name the supplier as "shipper," and be "to order," without naming a specific consignee, or as otherwise specified in writing by the supplier.[5] The third party agreements

---

[4] *See generally* Transcripts of Depositions of Robert J.C. Fredericks, David Elua, James T. Lee, III, and Stephanie R. Milbrath, Exh. P to Defendants' Memorandum in Opposition to Motion to Set Security ("Defendants' Opp.")(Rec. Docs. 115-4 to 115-8); Affidavits or Declarations of Alex Goridjko, Klyde Matthews, Fred Cox, Janice Atterberry, Marzanna Omilian, D. Neil Carey, and Herbert Hoover, Exhs. AA - LL to Defendants' First Motion for Summary Judgment (Rec. Doc. 92-7 at pp. 14 - 156); Declarations of Lesley Kinbrough and Fred Cox, Exhs. A and B to Defendants' Supplemental Brief on the Effect of Uniform Commercial Code Article 2-401 (Rec. Doc. 125-1 & 125-2). Although Plaintiff was given the opportunity to depose the suppliers' representatives, it apparently chose not to do so. *See* Defendants' Opp. (Rec. Doc. 115) at 4.

[5] *See* Third Party Agreements, Exh. 36 to Plaintiff's Memorandum in Support of Motion for Security ("Plaintiff's Mem.") (Rec. Doc. 121-2, pp. 15-42) at ¶¶ B and I.

also dictated that, unless otherwise directed by the supplier, the original bills of lading were to be released by the vessel interests, or their agents, only to the supplier.[6] Additionally, unless otherwise authorized by the supplier, the cargo was not to be discharged from the vessel unless the original bills of lading were presented at the port of discharge.[7]

Further, the third party agreements gave the supplier "the unrestricted, unqualified right, notwithstanding any instructions or requests from [CI] to the contrary, to divert the vessel, which has been chartered, to another port of discharge."[8] Only if CI paid for the cargo in full would full control of the vessel revert to CI as the vessel charterer.[9] Finally, the third party agreements required that the GLACIER BAY charter party, to which the suppliers were to be third party beneficiaries, include language consistent with the above-described provisions.[10] The third party agreements additionally required the charter party to authorize the supplier to hold the vessel outside the territorial waters of the discharge port, or to divert the vessel to another discharge port, at any time, including after discharge had commenced.[11]

Given the foregoing, the Court is not convinced that title to the cargo had transferred to CI, pursuant to the agreements between CI and the suppliers, as of the time of the attachment.

---

[6] *Id.* at ¶ C.

[7] *Id.* at ¶¶ E(7) and H(1).

[8] *Id.* at ¶¶ D and E(4).

[9] *Id.* at ¶ D.

[10] *Id.* at ¶ E.

[11] *Id.* at ¶ E(4). The GLACIER BAY charter party did include all of the clauses mandated by the third party agreements. *See* June 16, 2009 Charter Party of the M/V GLACIER BAY (Rec. Doc. 9-3) at Clauses 35, 37-39, and Addenda 1 and 3.

And, on the showing made, the Court likewise is not persuaded that the cargo had been delivered, for purposes of §4-2-401, as of the time of attachment.

In particular, and not disputed by Plaintiff, negotiable bills of lading made out "to the order of" serve as documents of title that, upon proper endorsement and delivery, can transfer property rights in the covered cargo.[12] Significantly, no assertion has been made that, as of the July 1, 2009 attachment, any of the suppliers had endorsed and delivered original bills of lading, issued in accordance with the terms of the third party agreements and the charter party, to CI.

Similarly, delivery, for purposes of transferring title pursuant to §4-2-401, occurs when the seller "has finally committed himself in regard to specific goods" and requires that he "put and hold conforming goods at the buyer's disposition." *See* A.C.A. §§ 4-2-503 & 4-2-401, cmt. 4. In other words, "[d]elivery requires that the seller intend to relinquish control over the goods to the buyer by placing them at the buyer's disposal." *See American State Bank of Olivia v. Ladwig & Ladwig, Inc.*, 646 N.W.2d 241, 246 (Minn. App. 2002). In the absence of endorsed and delivered original bills of lading, and considering the power conferred upon the suppliers relative to the ultimate port of discharge for the chartered GLACIER BAY, the Court cannot find that, by merely allowing the loading of their cargo onto the sailing vessel, the suppliers "finally committed

---

[12] *See, e.g.,* A.C.A. § 4-1-201(6)( "Bill of lading" means a document of title evidencing the receipt of goods for shipment issued by a person engaged in the business of directly or indirectly transporting or forwarding goods. The term does not include a warehouse receipt.); A.C.A. § 4-1-201(16) ( "Document of title" means a record (i) that in the regular course of business or financing is treated as adequately evidencing that the person in possession or control of the record is entitled to receive, control, hold, and dispose of the record and the goods the record covers and (ii) that purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass. The term includes a bill of lading, transport document, dock warrant, dock receipt, warehouse receipt, and order for delivery of goods. An electronic document of title means a document of title evidenced by a record consisting of information stored in an electronic medium. A tangible document of title means a document of title evidenced by a record consisting of information that is inscribed on a tangible medium.).

themselves" and "relinquished control over the cargo by placing it at CI's disposal."

Nor does the Court find that the "24 hour notice" or the "Cargo Declaration" documents submitted to the Department of Homeland Security, Customs and Border Protection ("Customs") by the vessel's agent, Page & Jones, Inc., on or about June 26, 2009, and July 2, 2009, compel a different conclusion. There is no evidence that the suppliers instructed Page & Jones how the shipper and consignee were to be identified in those documents, or even that they were aware of the documents' contents relative to the identity of the shipper and/or the consignee.[13] In any event, neither of the documents was an original or even a copy of a negotiable bill of lading. The "24 hour notice" document is unsigned, and has "XXXX" in the sections requiring dates and a description of the quantity and weight of the transported goods.[14] Nor does it appear to have included the "Conditions of Carriage" on the overleaf of the document as contemplated by the form.[15] Similarly, the documents attached to the July 2, 2009 "Cargo Declaration" are marked "Copy Non-Negotiable" and have the consignee, notify address, and signature stricken through.[16] They also appear to be missing the "Conditions of Carriage" overleaf.[17]

---

[13] Indeed, consistent with the third party agreements and the charter party, on June 18, 2009, van Weelde Chartering, B.V., the chartering broker, transmitted an email to the vessel's agent, Page & Jones, Inc., expressly instructing that the bills of lading were to name the suppliers as shippers and be "to order" without naming a specific consignee. *See* June 18, 2009 Email, Exh. E to Defendants' Opp. (Rec. Doc. 115-1) at ¶10.

[14] *See* "24 Hour Notice", Exh. 4 to Plaintiff's Mem. (Rec. Doc. 121, p. 15).

[15] *Id.*

[16] *See* Cargo Declaration, Exh.10 to Plaintiff's Mem. (Rec. Doc. 121, pp. 40-42).

[17] *Id.* As previously expressed to the parties to this litigation, the Court finds troubling Page & Jones, Inc.'s submission of documents reflecting apparently inaccurate information to Customs. The same is likewise true relative to the "Certificates of Origin" dated July 3, 2009, and bearing the certification and seal of the Mobile, Alabama Chamber of Commerce. *See* Plaintiff's

The ten bills of lading that were prepared on or about July 15, 2009, but bear an issue date of July 3, 2009, and identify CI as the shipper and name various consignees, likewise do not compel the relief requested by Plaintiff's motion.[18]  It is undisputed that the suppliers and CI anticipated that the suppliers would *eventually* transfer ownership and relinquish control of the cargo to CI such that CI could then sell the cargo to another purchaser.  Significantly, however, for purposes of the issue presently before the Court, this had not yet occurred as of the time relevant here, *i.e.,* Plaintiff's July 1, 2009 attachment, or even the July 6, 2009 release, of the cargo.[19]

In conclusion, on the showing made, the Court is not persuaded that, as of the time of attachment, the M/V GLACIER BAY cargo was owned by either of the Defendants. Accordingly, the Court denies Plaintiff's request that Defendants be required to post a bond as substitute security for the previously attached and released cargo.

---

Exhibit 27 (Rec. Doc. 121-1).  Significantly, however, the Court is not charged in this instance with determining whether any statutory or regulatory violation occurred.  Nor is this a situation where the Court is asked to determine the rights of the suppliers and CI relative to a third party who purported to purchase the cargo in question in good faith and in reliance upon endorsement and delivery of a seemingly valid negotiable bill of lading.  Rather, the Court is only to decide whether Defendants should be required to post the security sought by Plaintiff.

[18]   *See* Exh. 29 to Plaintiff's Mem. (Rec. Doc.  121-1, pp. 36 - 45).

[19]   The Court notes that the UCC provides for the issuance of bills of lading at destination, or any other place (that is not the place of shipment) requested by the consignor, and for th issuance of substitute bills of lading.  *See* U.C.C. § 7-305; *see also* A.C.A. § 4-7-305.

Given the Court's denial of the Plaintiff's motion for security, which is the only pending request for relief from Plaintiff, **IT IS FURTHER ORDERED** that Defendants' motions for summary judgment (Rec. Docs. 92 and 95) are **DENIED** as **MOOT**.

New Orleans, Louisiana, this 3rd day of January 2011.

_____
**KURT D. ENGELHARDT**
**United States District Judge**